**Robert PARRILLO, Plaintiff–Appellant,**

v.

**COMMERCIAL UNION INSURANCE COMPANY, Defendant–Appellee.**

No. 95–3947.

United States Court of Appeals, Seventh Circuit.

Argued April 4, 1996.

Decided June 5, 1996.

Rehearing Denied July 8, 1996.

Michael J. O'Halloran, Thomas M. Enright, Keely Truax (argued), Parrillo, Weiss & O'Halloran, Chicago, IL; for Plaintiff-Appellant.

Steven B. Belgrade, John A. O'Donnell, Joseph G. Howard (argued), Belgrade & O'Donnell, Chicago, IL, for Defendant-Appellee.

Before POSNER, Chief Judge, and KANNE and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Robert Parrillo, the senior partner in the Chicago law firm of Parrillo, Weiss & O'Halloran, owned a beauty of a boat. Actually, "boat" doesn't do it justice; it was a yacht— and a 77–footer no less. Parrillo had it custom built in 1985 in Ziarregio, Italy, at a cost of one million dollars. He christened it the *Lascia Fare*, Italian for the French laissez-faire.

According to Parrillo, nothing on his million-dollar yacht was "off-the-shelf"; everything was "custom, custom, custom." Parrillo's pursuit of perfection is perhaps epitomized by the wood paneling and veneer throughout the vessel. All of the woodwork was of "the same finely grained wood, probably from the same tree." Despite his firm belief that the *Lascia Fare* had attained the desired state of perfection, Parrillo put her up for sale in 1990. His initial asking price of $1.5 million was lowered at least once, but still no buyer could be found. Parrillo began leasing a different boat, the *Doubloon*, while the *Lascia Fare* remained in wet storage at Bradford Marine in Florida. In the spring of 1993, Parrillo decided to resume using the *Lascia Fare* and told the captain to prepare the vessel for use. A week later, the *Lascia Fare* caught fire, suffering ex-

tensive damage. The disagreement between Parrillo and his insurance company over the price tag to put on that damage is the origin of the case before us.

From 1985 until the time of the fire, the *Lascia Fare* was insured by Commercial Union Insurance Company. The "agreed value" of the yacht under the annually renewed policy was a million dollars, and the policy carried a $100,000 deductible. After the fire, Commercial Union hired a surveying company, Pascoe & Associates, to determine the extent of the damage to the *Lascia Fare*, and to solicit bids for necessary repairs to the vessel. At the request of the parties, a total of four shipyards submitted bids. Bradford Marine, the marina which housed the *Lascia Fare* for the past few years, submitted a bid of $881,892.56. Chinook Marine, owned by an acquaintance of Parrillo, bid $906,767. Glass–Tech bid $520,000, but did not provide a detailed breakdown of its bid. The winning bid, "guaranteed not to exceed" $532,236.53, came from Cable Marine, Inc. of Fort Lauderdale, Florida.

Parrillo wanted Commercial Union to accept the Bradford bid. He felt it was impossible to restore the *Lascia Fare* for only half a million dollars, and preferred Bradford because "they take the attitude that the customer is always right." Of the Cable Marine bid, he said, "The bid is a joke. In the marine circles I know of, the ones I travel in, the bid is a joke." Commercial Union refused to pay more than the amount of the Cable bid, and offered Parrillo a choice between the three options set forth in his insurance policy. He could have Cable Marine do the work for the "not to exceed" price; he could pay someone else to do the work and be reimbursed up to the amount of the Cable bid; or he could sell the boat for salvage and take the amount of the Cable bid in cash. Parrillo found none of these options acceptable. Concerned that Cable would leave his boat looking "like a Winnebago," Parrillo wanted Commercial Union to guarantee that he would be "100 percent satisfied" with Cable's work, and to bear the cost of having the work completely redone if it didn't measure up to his expectations. Commercial Union refused to make a guarantee of personal satisfaction.

Cable Marine suggested that Parrillo hire his own surveyor to assuage his doubts about the quality of Cable's work, and recommended Gerald Slakoff. Parrillo took the recommendation, though he appears to have done so with an eye more toward litigation than toward restoring his boat. He asked Slakoff to take a look at the *Lascia Fare*, but to "only do a complete survey if you believe that you can render Cable's bid incomplete or if you believe that the survey will materially assist me in my law suit against Commercial Union." Slakoff testified that all of the bidders were reputable boatyards, and that Cable Marine had the facilities, expertise, and access to materials to do a good job on the *Lascia Fare*. He estimated that repairs would cost about $843,027, and that the salvage value of the boat was between $150,000 and $200,000.

Soon after Slakoff's survey, on August 25, 1993, Parrillo sold the boat for a salvage value of $312,000, and accepted payment in the amount of the Cable bid (minus a $100,000 deductible) from Commercial Union. After selling the boat and collecting the insurance (bagging $744,236.53), he claimed that the boat should have been declared a total loss. If it was a total loss Parrillo would be entitled to the full agreed value of the boat— one million dollars.

Parrillo sued Commercial Union, raising a number of claims based on what he said was misconduct by the insurer. He claimed breach of contract on the theory that the *Lascia Fare* was a constructive total loss under the terms of the policy. He alleged that Commercial Union violated the Illinois Consumer Fraud and Deceptive Practices Act by engaging in a "deceptive and malicious scheme" to defraud its insureds by deliberately procuring lowball bids. Finally, he sought damages of $15,000 per week for loss of use of the boat.

Commercial Union moved for summary judgment and the district court granted the motion on all counts. Specifically, the court found there was no evidence to support the "malicious conspiracy to defraud" claim, that Parrillo could not recover for loss of use, and

that Commercial Union complied with the plain language of the insurance contract. Parrillo moved to vacate the judgment. The court denied the motion to vacate as "a document that seems to [have been] filed more out of disappointment . . . than a reasoned attempt to take a look at what might have been wrong in the first place." This appeal followed.

We review the district court's grant of summary judgment *de novo, Smith v. Shawnee Library System,* 60 F.3d 317 (7th Cir.1995), drawing all reasonable inferences in favor of the losing party. *Bratton v. Roadway Package System, Inc.,* 77 F.3d 168 (7th Cir.1996). Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Roger v. Yellow Freight Systems, Inc.,* 21 F.3d 146 (7th Cir. 1994). Despite the glamorous yacht at the factual center of this case, the legal issues revolve around the less-than-glamorous task of interpreting an insurance policy. In Illinois, the interpretation of insurance contracts is a matter of law, *Baker v. America's Mortgage Servicing, Inc.,* 58 F.3d 321 (7th Cir.1995), and insurance cases are therefore often appropriate for summary judgment. *Security Ins. Co. of Hartford v. Schipporeit, Inc.,* 69 F.3d 1377 (7th Cir.1995). But even cases that hinge largely on contract interpretation may not be decided on summary judgment if the court is presented with disputed, material facts.

The district court stated that "Parrillo's failure to comply with Local Rule 12(n)

means there are no material facts in dispute." Judge Zagel, who heard the case in the district court, was correct in noting that, had Parrillo failed to comply with the requirements of Rule 12(n),[1] he would be deemed to have admitted the facts as presented by Commercial Union. *LaSalle Bank Lake View v. Seguban,* 54 F.3d 387 (7th Cir.1995). This statement, however, led to considerable dispute over the question of whether Parrillo had complied with Rule 12(n), whether Commercial Union had complied with Local Rule 12(m),[2] and, if one or both of the parties had failed to comply, who could be deemed to have admitted what.

Fortunately, it is not necessary for us to determine whether one or both of the parties failed to comply with the local pleading rules. Judge Zagel, in denying Parrillo's motion to reconsider, clearly stated that his "aside" about Rule 12 compliance was "not crucial to the court's opinion." More important, a thorough examination of the entire record reveals that however the Rule 12 question is decided, no genuine issue of material fact exists in this case. This is not to say that the parties agree on the facts here. On the contrary, many facts are disputed. But factual disputes will only prevent summary judgment if the disputed issues are material, and in this case none of them are. A disputed issue of fact is considered material for the purpose of summary judgment "only if it might affect the outcome of the case under governing law." *Anweiler v. American Elec. Power Serv. Corp.,* 3 F.3d 986, 990 (7th Cir. 1993) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Once the legal issues in this

---

1. Northern District of Illinois Local Rule 12(n) states that

[e]ach party opposing a motion filed pursuant to F.R.Civ.P. 56(e) shall serve and file (1) any opposing affidavits and other materials referred to in F.R.Civ.P. 56(e); (2) a supporting memorandum of law; and (3) a concise response to the movant's statement that shall contain; (a) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and (b) a statement, consisting of short numbered paragraphs, of any additional facts that require denial of summary judgment. . . .

All material facts set forth in the statement of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.

2. Northern District of Illinois Local Rule 12(m) states that

[i]f additional material facts are submitted by the opposing party pursuant to section N of this rule, the moving party may submit a concise reply in the form prescribed in section N for the response. All material facts set forth pursuant to section N(3)(b) will be deemed admitted unless controverted by the statement of the moving party.

case are defined, it becomes clear that none of the factual disputes are material as they would need to be to defeat summary judgment.

■ Parrillo's primary argument on appeal is that he should have received the full million dollars from Commercial Union because the boat was a constructive total loss. He claims that by failing to declare the *Lascia Fare* a total loss, Commercial Union breached its contract with him. In support of this argument, Parrillo cites definitions of "constructive total loss" from a number of sources, including surveyor Slakoff[3] and *Black's Law Dictionary*. But strangely, Parrillo fails to discuss the truly relevant definition of the term—the one found in the insurance policy itself. The language of the contract is plain: "There shall be no recovery for a constructive Total Loss hereunder unless the expense of recovering and repairing the Vessel would exceed the Agreed Value." There is no dispute over the agreed value of the *Lascia Fare*. It is also undisputed that four boatyards and Parrillo's own witness agreed the *Lascia Fare* could be restored for less than the agreed value. The range of estimates is broad, but not one of the bids crossed the million-dollar threshold, and at least two of them fell well below it. According to the plain language of the policy, the *Lascia Fare* was not a constructive total loss. To argue that it was borders on the frivolous.

Parrillo attempts to stir up a genuine issue of material fact by arguing that the *Lascia Fare* could never be restored for the amount of the Cable bid. In support of his argument, he cites the Slakoff survey, the Bradford and Chinook bids, and testimony that the new owner of the *Lascia Fare* spent over $900,000 on renovations. The problem with this argument is that whether it was possible to restore the *Lascia Fare* for $532,236.53 is not relevant to the outcome of this case. While that factual question is certainly disputed, it is not material; Cable guaranteed it would restore the *Lascia Fare* for an amount *not to exceed* $532,236.53. Cable Marine was obligated to do the work for that price.[4] Whether Cable Marine could make a profit on the job, just break even, or lose its shirt on the job is not material to the question of whether Commercial Union fulfilled its contractual obligation to Parrillo. Commercial Union's duties under the insurance contract were satisfied by offering to pay the guaranteed full cost of restoration. Parrillo tried to extend the insurer's contractual duties, demanding guarantees of personal satisfaction. As Judge Zagel put it, these "obligations of personal satisfaction sprang only from Parrillo's imagination, not the policy's terms."

■ To buttress his argument that the Cable bid was inadequate, Parrillo turns to a clause in the policy which states that the "cost of repairs [is] to be paid without deduction. 'New for Old' except as follows: ... (2) On any plywood, metal, or fiberglass portions of the Yacht, this company shall not be liable for more than: (a) The cost of making repairs in accordance with the customary and generally accepted repair practices[.]" Parrillo argues that the district court mistakenly believed that "Commercial Union was not liable for more than 'the cost of making repairs in accordance with ... generally accepted repair practices.'" Basing its decision on this erroneous standard, Parrillo argues, the district court found that Commercial Union had indeed fulfilled its contractual obligations. But a "litigant wanting to challenge the core of the district court's holding must do so in its opening

---

**3.** Slakoff did testify that he considered the *Lascia Fare* a total loss. He defined that term, however, as the cost of repairing the boat plus the salvage value. This definition is far more inclusive than the definition set forth in the contract. It is interesting to note that even if we were to ignore the clearly defined terms in the policy itself in favor of the Slakoff definition, the boat would not be a constructive total loss. Adding the actual salvage value of $312,000 to the guaranteed cost of repairs, we come up with $844,236.53, precisely the amount collected by Mr. Parrillo (minus his deductible). The boat would only be a total loss under Slakoff's broader definition if the insurer were somehow required to pay more than the lowest guaranteed cost of repairs.

**4.** If Cable failed to restore the *Lascia Fare* at its guaranteed price, Parrillo knew that he would not be without recourse. As he noted in a fax to Slakoff, Parrillo "decided to sue the insurance company directly rather than risk an unhappy repair experience with Cable, against whom I would have only ordinary contract rights and not those special rights that inure to an insured."

brief and not hold its fire until after the appellee has filed its only brief." *Horn v. Transcon Lines, Inc.,* 7 F.3d 1305, 1308 (7th Cir.1993). This argument is raised for the first time in Parrillo's reply brief, and therefore it is waived. Circuit Rule 28(f), *Giffin v. Summerlin,* 78 F.3d 1227 (7th Cir.1996) (per curiam). We cannot allow an appellant to circumvent the adversarial process by raising new arguments in reply. To do so would be prejudicial not only to the appellee, but potentially to the appellant as well. The appellee would have no opportunity to respond to the new claims, and the court would be in an awkward position. We could either accept wholesale an "argument" that had never been fully briefed or argued, or we could put ourselves in the position of the appellee, doing her research and seeking out counter-arguments on her behalf. Either way, the court would be (or would seem to be) choosing sides before ever looking at the substance or the merits of an argument. Because Parrillo failed to raise his "New for Old" argument until way too late, we will say nothing about it except that it is waived.

■ Parrillo also appeals the district court's disposition of his fraud claim. The essence of this claim is that it was not possible to restore the *Lascia Fare* for $532,236.53; therefore Commercial Union must be involved in a conspiracy to procure fraudulent bids and underpay claims. First, we repeat that whether it was possible for Cable to restore the boat at a profit for the amount of the bid is irrelevant. Cable guaranteed that it would be restored for that amount. According to Parrillo's own witness, Cable is a reputable boatyard with the facilities and expertise to restore the *Lascia Fare.* Next we turn to the facts that Parrillo relies on to support his allegations of fraud. His "evidence" consists of: the fact that Commercial Union selected Cable's detailed guaranteed bid over Glass–Tech's lower but open-ended bid; Commercial Union's hiring of a lawyer before Parrillo filed his complaint; and one quotation taken entirely out of context.[5] In deciding a case on summary judgment, the court is not required to draw every possible inference in favor of the non-movant, only all *reasonable* inferences.[6] *Donohoe v. Consolidated Operating & Prod. Corp.,* 982 F.2d 1130, 1137 (7th Cir.1992). Conclusory allegations are not enough to defeat summary judgment, *Hedberg v. Indiana Bell Telephone Co.,* 47 F.3d 928, 931 (7th Cir.1995), and conclusory allegations are all Parrillo has to offer.

■ The final claim Parrillo raises is that he is entitled to $15,000 per week in damages for loss of use of his boat. The district court correctly pointed out that there is no recovery for loss of use of pleasure boats. *The Conqueror,* 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937 (1897); *Snavely v. Lang,* 592 F.2d 296 (6th Cir.1979). Parrillo argues that the *Lascia Fare* was not strictly a pleasure boat; he chartered it out from time to time for $15,000 per week. There are a number of bars to this claim. First, he no longer owns the boat, so even if we accept as fact his claim that the boat was occasionally chartered out, he could only recover up to the date of sale. Second, the boat was inactive at the time of the fire. It had been in storage for way over a year, and was in fact required to be in storage as a condition of coverage under the Commercial Union poli-

**5.** This quotation was so grossly distorted we feel compelled to put it in context ourselves. Parrillo's appellate brief charges "Commercial Union *admitted* that it routinely required arbitration for the purpose of coercing a claimant to 'give up.' " (Plaintiff's brief at 19.) (Emphasis in original.) When we turn to the deposition of Commercial Union's Kent Smith, cited in support of this alleged admission, we see that the testimony says the opposite of what Parrillo would have us believe. Parrillo's glaring misrepresentation of this testimony can only be appreciated by reading the testimony itself:

Q: The way you administer your claims, Mr. Smith, I'm gathering from the way you answer your questions here that you offer arbitration and if it's not accepted, you agree not to arbitrate or forget the arbitration somehow? Is that basically how you do business?

A: The claimant may give it up. They're still entitled to do it.

Q: But in other words, you leave it to the choice of the claimant whether or not to arbitrate?

A: Right....

**6.** For example, the inference Parrillo asks us to draw—that the hiring of an attorney is an admission of wrongdoing—is an unreasonable one.

cy. In order to recover for loss of use, " '[t]here must be actual loss, and reasonable proof of the amount.' In other words, there must be a loss of profits in its commercial sense." *The Conqueror*, 166 U.S. at 133, 17 S.Ct. at 519. Parrillo asserts that, at some point in the future, an unspecified entity might have offered him $15,000 a week to charter the *Lascia Fare*, and he might have accepted. This is only speculation, not an allegation of actual loss.[7] There is no evidence that, during the time he retained ownership of the *Lascia Fare*, Parrillo lost any commercial use of the boat. The district court was correct to enter summary judgment in favor of Commercial Union on the loss of use claim.

Recently, in addressing the claims of a *pro se* litigant, we expressed the view that "[o]ne of the real dangers in representing yourself is that you sometimes get to believe that your case is better than it actually is." *In re CLDC Management Corp.*, 72 F.3d 1347, 1348 (7th Cir.1996). This case perhaps demonstrates that there may be a similar danger when an attorney-plaintiff is represented by a firm in which he is the senior partner. The decision of the district court is

AFFIRMED.

---

**7.** While he asks us to engage in this speculation, Parrillo himself testified that he planned to re- turn the *Lascia Fare* to active service specifically for use by his family.