In the

# United States Court of Appeals
### For the Seventh Circuit

No. 04-4114

HALIMA ABDULLAHI, on her own
behalf and as Administrator for the
Estate of JAMAL MOHAMED, Deceased,

*Plaintiff-Appellant*,

and ALI MOHAMED ABDI,
whereabouts unknown,

*Involuntary Plaintiff-Appellant*,

*v.*

CITY OF MADISON, SERGEANT PATRICK
GRADY, OFFICER HERBERT MUELLER,
OFFICER JESSICA MURPHY and CAPITOL
POLICE OFFICER JAMES BROOKS,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 03-C-0631—**Barbara B. Crabb**, *Chief Judge*.

ARGUED JUNE 8, 2005—DECIDED SEPTEMBER 12, 2005

Before CUDAHY, EVANS and WILLIAMS, *Circuit Judges*.

CUDAHY, *Circuit Judge*.   Plaintiff Halima Abdullahi,
mother of a man who died during (or shortly after) defen-

dant police officers' attempts to subdue and arrest him, brought a Fourth Amendment Claim against the City of Madison and the police officers involved, alleging that one of the officers used excessive force during the arrest and that the other officers failed to intervene. The district court granted defendants' motion for summary judgment, ruling that there was no evidence that the officers engaged in any objectively unreasonable conduct. Plaintiff now appeals. For the reasons set forth here, we reverse and remand.

## I.  FACTUAL BACKGROUND & DISPOSITION BELOW[1]

This case marks the tragic final chapter of a troubled life. Decedent Jamal Mohamed, the son of Somali immigrants, suffered from severe Post Traumatic Stress Disorder (PTSD) due to various traumatic experiences he endured as a child in his homeland. As a result, he was prone to having "episodes" of disorientation and erratic behavior. Mr. Mohamed was apparently having one of these episodes on the fateful afternoon of November 20, 2002.

At approximately 1:18 p.m. on that day, nurse Pamela McCarty was in her Jeep on her way to work when she noticed the decedent staggering across three lanes of traffic on University Avenue in Madison, Wisconsin. She observed that he was breathing heavily and in apparent physical distress, and he stumbled and fell as he attempted to negotiate the curb. Ms. McCarty got out of her Jeep and attempted to assist Mohamed, at which point he attempted

---

[1] These facts are taken principally from the district court's Opinion and Order below, *Abdullahi et al. v. City of Madison et al.*, 2004 WL 2535426, at *1-6 (Nov. 5, 2004, W.D.Wis.) (Unpublished Opinion and Order). Most of the basic facts surrounding Mohamed's encounter with the defendant police officers are not disputed.

to climb into her Jeep, threw himself against the vehicle, ran back out into traffic, threw debris at her and then grabbed her hair and clawed at her uniform. McCarty attempted to free herself by hitting Mohamed in the head with her cell phone, and she ultimately succeeded after Mohamed had punched her once in the face.

Meanwhile, defendant City of Madison Police Officer Jessica Murphy received dispatches reporting that a male was causing a disturbance in a tailor's shop in the 2800 block of University Avenue. As she was driving to University Avenue, she received further dispatches alerting her to Mohamed's altercation with McCarty by the roadside. When Murphy arrived at the scene of the altercation, she observed Mohamed lying on his back on the sidewalk near the curb. Fearing that Mohamed might need medical attention, she called for fire rescue. As Murphy approached, Mohamed sat up and began swinging his belt over his head by the buckle.

Defendants Sergeant Patrick Grady and City of Madison Officer Herbert Mueller were also on patrol in the area when they heard the dispatches related to Mohamed. When they heard additional radio transmissions that Mohamed may have grabbed a pedestrian and was swinging a belt at officer Murphy, they sped to the scene on an emergency basis. Defendant State Capitol Officer James Brooks was also in the area. After seeing Murphy's squad car speeding toward the scene with its siren activated, Brooks got into his squad car, turned on his scanner and headed in Murphy's direction. While en route he heard a female officer say something to the effect of "he's whipping his belt at me" and "step it up."

Shortly thereafter, Brooks and Grady arrived at the scene. They observed that Mohamed was flailing with his belt and making a guttural, growling noise. Brooks testified that, as he approached, Mohamed jumped up from his knees to a standing position, a move so "athletic" that it "shocked"

him. Defendants Grady, Murphy and Brooks them moved in to subdue Mohamed. Murphy grabbed one of Mohamed's arms while Brooks and Grady grabbed the other. The three officers moved Mohamed up against the Jeep to gain control over him and then took him to the ground, onto his stomach. Brooks testified that it was the most "peaceful" takedown he had ever been a part of.

Once on the ground, Mohamed began kicking his legs, moving his arms so they could not be handcuffed and arching his back upwards as if he were trying to escape. Grady attempted to control Mohamed's legs, and Murphy, who was on Mohamed's left, was able to cuff his left hand. At some point during the encounter, defendant officer Mueller arrived on the scene and grabbed Mohamed's right thigh and ankle in an attempt to keep him under control. Defendant Brooks was on Mohamed's right side, and he placed his right knee and shin on the back of Mohamed's shoulder area and applied his weight to keep Mohamed from squirming or flailing. Brooks increased the pressure on Mohamed's back until Mohamed stopped arching his back upward. Mohamed apparently stopped struggling about 15-20 seconds after Brooks began to apply his weight to Mohamed's shoulder area, and Brooks was able to cuff Mohamed's right wrist and connect the handcuffs to those that Murphy had applied on Mohamed's left wrist. Brooks took his weight off Mohamed after the handcuffing was complete. In all, Brooks estimates that his knee and shin were on the back of Mohamed's shoulder for approximately 30-45 seconds.

Brooks testified that Mohamed was still breathing after the handcuffing was completed and Brooks had got off him. Grady, who was trying to maintain control of Mohamed's legs, suggested that Mohamed's legs be restrained. By this time, several other police officers had gathered at the scene, and one of them (Officer Morovic) ran to his squad car to retrieve a kickstop restraint. At some point during this

sequence of events (the parties differ on this point) Officer Jerry Goehring walked up to the scene.[2] Goehring did not observe any movement from Mohamed, and the defendant police officers all soon realized that Mohamed was not breathing. Mueller and Grady, who were still holding onto Mohamed's legs, felt him go limp, and Brooks and Grady both said something to the effect that Mohamed was no longer breathing.

Fire rescue workers had just arrived at the scene, and the police officers removed all restraints so that paramedics could initiate resuscitation efforts. Mohamed died at 2:39 p.m., approximately two and a half minutes after the defendant officers had taken him to the ground.

Plaintiff filed the present suit on November 10, 2003, alleging that Officer Brooks used excessive, deadly force to subdue her son Jamal Mohamed by kneeling on his back while he was lying prone on the ground, causing chest and neck trauma ultimately resulting in his death, in violation of the decedent's Fourth Amendment rights. She also brought Fourth Amendment claims against the other defendant police officers—Murphy, Grady and Mueller—under 42 U.S.C. § 1983, alleging that they observed Brooks using an unreasonable level of force against Mohamed and failed to intervene.

---

[2] Plaintiff insists that Goehring arrived prior to Morovic's retrieval of the kickstop restraint, while the district court and the defendants maintain that Goehring arrived at the scene only after Morovic had begun to apply the kickstop. Plaintiff insists that Goehring's testimony regarding the timing of his arrival creates inconsistencies in the officers' collective testimony as to when Mohamed stopped breathing. But ultimately not much turns on this point since under either version of events it is undisputed that Brooks' knee was already off Mohamed's back when Goehring approached, and that Mohamed stopped breathing shortly after Brooks' knee was removed.

Four different doctors provided medical testimony regarding the cause of Mohamed's death. They all agree that Mohamed died of chest and neck trauma, including a collapsed left lung and injuries consistent with strangulation. They all observed that a tremendous amount of air had been forced into the tissue surrounding Mohamed's lungs, as if his chest had been crushed or squashed. The medical experts differ as to their certainty about the exact cause or timing of these injuries.

Dane County Coroner John Stanley officially listed the cause of death as "(a) Traumatic Asphyxia, (b) Truncal Emphysema/Tension; Pneumothorax [collapsed lung]/ Laryngeal [neck area] hemorrhage, (c) Neck and Chest trauma." (PRFF (Madison) at ¶ 78.) However, he was not able to explain the exact causes of the trauma, stating that the origins of the collapsed lung and neck hemorrhage remain an "unanswered question." (*Id.* at ¶¶ 20-21.) Defendant Brook's Expert, Dr. Robert W. Huntington III, who performed the initial autopsy on Mohamed, testified that he had never seen such a severe neck hemorrhage before, and he was unable to determine the exact cause or timing of the injuries. He did say that Mohamed's injuries were consistent with strangulation and "would strongly suggest force while he was alive," though he said they presented a "real conundrum" since they were not explained by the defendant police officers' accounts of their encounter with Mohamed. (PRFF at ¶ 43, S.J. Exh. K at 5.) Dr. Billy Bauman, hired by defendants Grady, Mueller and Murphy (the Madison city police officers), opined that Mohamed's injuries did not occur during his struggle with the defendant police officers, though he concedes that the injuries could have been the result of blunt force trauma and might have been related to Brooks' kneeling on Mohamed if Brooks had knelt on Mohamed's neck. (PPFF at ¶¶ 60-62.)

Finally, plaintiff's medical expert, Dr. Howard Adelman,

concurred that Mohamed died of trauma to the chest and neck, including a collapsed lung, and suffocation. He asserts that Mohamed's injuries were caused by trauma or force inflicted upon the decedent while he was still alive. He noted that these types of injuries occur "when the chest is compressed by an external weight or force and is prevented from expanding," creating a physiological chain of events "akin to drowning." (Adelman Aff., S.J. Exh. G at 18.) Dr. Adelman also concluded "to a high degree of medical probability and virtual certainty" that Mohamed's injuries "occurred during the struggle with the police officers," after he was already face-down on the ground. (*Id.* at 19.) Dr. Adelman reasons that Mohamed could not possibly have offered the resistance attributed to him by the defendants if he had been suffering from such traumatic injuries at the beginning of the encounter. Dr. Adelman also noted that the officers reported no visible injuries or difficulty breathing before taking Mohamed to the ground, and that his internal wounds were bloody and fresh when his body arrived in the coroner's office for examination.

Nurse McCarty and another civilian witness, Ms. Weinfurter, were standing near the scene of the incident (McCarty was standing 6-7 feet away), and they testified that Mohamed acted aggressively and that the defendant police officers did not hit, strike or choke Mohamed, nor do anything that might have caused him serious injury.

Following discovery, defendants moved for summary judgment and the district court granted this motion on November 4, 2005, ruling that plaintiff had adduced no evidence that Brooks had acted unreasonably under the circumstances, nor that he had caused the injuries to Mohamed's neck and chest. The court noted the absence of any eyewitness testimony suggesting that the police acted violently or unreasonably, and the court asserted that the mere fact of an injury does not suffice to create a question of fact regarding excessive force. *Abdullahi et al.*

*v. City of Madison et al.*, 2004 WL 2535426 (Nov. 5, 2004, W.D.Wis.) (Unpublished Opinion and Order). Plaintiff's appeal now comes before us.

## II.  JURISDICTION

The district court had jurisdiction over the plaintiff's constitutional and section 1983 claims under 28 U.S.C. §§ 1331 and 1343. The district court entered its judgment granting the defendants' motion for summary judgment on November 9, 2004, and the plaintiff timely filed her notice of appeal on December 1, 2004. We now have jurisdiction over the present appeal pursuant to 28 U.S.C. § 1291.

## III.  DISCUSSION

Plaintiff advances two claims here: (1) that defendant Brooks used excessive force in subduing Mohamed and (2) that the remaining defendants failed to intervene to stop or prevent the application of excessive force. Though legally distinct, the fate of plaintiff's failure to intervene claim is closely linked to that of her excessive force claim since, by definition, if there was no excessive force then there can be no failure to intervene.

### A.  Excessive Force

Under prevailing Supreme Court precedent, "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395

(1989) (emphasis in original). *Accord Brosseau v. Haugen*, 125 S.Ct. 596, 598 (2004) (citing *Graham* and applying this same standard); *Lawrence v. Kenosha County*, 391 F.3d 837, 843 (7th Cir. 2004) (same). This inquiry involves "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (citations and quotation marks omitted). Not surprisingly, this analysis is "not capable of precise definition or mechanical application" but "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citations and quotation marks omitted). *See also Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985) (the relevant question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure").

Additionally, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396. In excessive force claims, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Finally, "[a]s in other Fourth Amendment contexts, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. *Cf. Scott v. United States*, 436 U.S. 128, 137-39 (1978); *Terry v. Ohio*, 392 U.S. 1, 21 (1968) (in analyzing the reasonableness of a

particular search or seizure, "it is imperative that the facts be judged against an objective standard").

In the present case the excessive force claim is narrowly defined—it concerns only defendant Brooks' conduct during the arrest, and specifically his kneeling on Mohamed's back/shoulder area after he was already lying prone with his hands behind him. Plaintiff does not contest the reasonableness of attempting to restrain Mohamed, or of placing him on the ground in a prone position. In granting defendant police officers' motion for summary judgment below, the district court determined that there was no evidence that Brooks did anything unreasonable. The court implied that the plaintiff was attempting to "put[ ] word in Brooks's mouth" by arguing that there was a question of fact regarding where Brooks placed his knee or how much force he applied. 2004 WL 2535426, at *8. The court found it undisputed that Brooks' knee was only on Mohamed's shoulder blade, not on his neck or spine. *Id*. at *9. The court also noted that plaintiff has conceded that it was reasonable to take Mohamed to the ground, handcuff him and place him in leg restraints. Given these findings, the district court concluded that "[t]he undisputed evidence shows that defendant Brooks applied force to Mohamed's body in a manner and for a time period not likely to cause any serious injury to Mohamed." *Id*. at *10.

The court also asserted that violations of police practices were not determinative for liability purposes,[3] and that, absent evidence of objectively unreasonable conduct, the mere fact that Mohamed's injury may have been caused by Brooks was insufficient to avoid summary judgment. 2004 WL 2535426 at *10-11. The district court summarized

---

[3] The plaintiff had introduced testimony from police practices expert Dennis Waller, who testified that Brooks' attempt to restrain Mohamed violated standard police practices.

its conclusions by stating that

> even if one agrees that plaintiff has some evidence that would support an inference that Mohamed was not injured before his encounter with the police officers, [the plaintiff's] claim fails because she has adduced no evidence of specific wrongdoing . . . . no evidence to support her theory that Brooks applied force to Mohamed's neck or chest, much less that he did so in a manner that carried a substantial risk of causing death or serious bodily harm . . . . Absent evidence that defendant Brooks' actions were objectively unreasonable, plaintiff's excessive force claim against defendant Brooks fails.

*Id*. at \*12. In short, the district court concluded that plaintiff's claim hinges on speculation—rather than evidence—of unreasonable conduct.

We review the district court's summary judgment ruling *de novo*. *Fix v. Quantum Indus. Partners LDC*, 374 F.3d 549, 552 (7th Cir. 2004); *Nevel v. Village of Schaumburg*, 297 F.3d 673, 678 (7th Cir. 2002). Summary judgment is warranted when the evidence, when viewed in a light most favorable to the non-moving party, presents "no genuine issue as to any material fact" such that "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In applying this standard, all disputed issues of fact are to be resolved in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

Viewing all the evidence, as we must, in the light most favorable to the plaintiff, we are satisfied that there remain sufficient factual questions to reach a jury, and thus that the district court's grant of summary judgment was erroneous. It is undisputed that (1) Brooks knelt on Mohamed's shoulder or back for 30-40 seconds while Mohamed was prone on the ground, and (2) Mohamed died roughly two

minutes later of severe injuries consistent with pressure or crushing trauma to the chest and neck area. There is competent expert medical testimony that Mohamed suffered these injuries after being put on the ground by the arresting officers. Based on these straightforward facts alone, there is an issue of material fact as to whether Brooks used an unreasonable amount of force against Mohamed. No one contends that deadly force was justified once Mohamed was lying prone on the ground with his arms behind him, *see Garner*, 471 U.S. at 11 (ruling that deadly force is justified only where the officer "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others"), and yet the record supports an inference that Brooks knelt on Mohamed with enough force to inflict lethal injuries. Accordingly, it is for a jury, and not for us, to weigh all the evidence and choose between competing inferences.

Of course the plaintiff's claim must fail if Brooks' conduct is considered reasonable as a matter of law. The defendant police officers contend—and the district court so ruled—that Brooks' efforts to subdue Mohamed were objectively reasonable under the circumstances. Both the defendants and the district court rely heavily on *Brownell v. Figel*, 950 F.2d 1285 (7th Cir. 1991), and *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997), in making this argument. However, a careful reading reveals that these cases are not particularly helpful to the defendants' cause.

In *Brownell*, we rejected an excessive force claim advanced by a plaintiff who was involved in a car accident, was taken unparalyzed to a hospital and was subsequently found to be paralyzed after leaving the hospital and being in police custody. Even conceding that the plaintiff may have been in police custody while he suffered his injury, we refused to indulge plaintiff's "logic akin to the doctrine of res ipsa loquitur." 950 F.2d at 1292. Though there was

ample evidence that plaintiff "left the hospital able to move and returned a quadriplegic," absent any evidence of specific *unreasonable* conduct on the part of the officers, plaintiff's claim was doomed. *Id*. A plaintiff may not simply claim that the facts support an inference of "excessive force, the precise nature of which has yet fully to come to light." *Id*. The Court also noted that "although not dispositive, no evidence was presented that Brownell returned to the hospital with bruises or other signs of excessive force." *Id*. at 1293.

*Phillips* concerned the arrest of a an extremely overweight individual with preexisting health problems that were not "observable to the untrained eye."[4] 123 F.3d at 594. After taking decedent to the ground and subduing him in a manner very similar to the technique used by the defendant officers in this case,[5] the officers left him lying face-down on the ground with his hands handcuffed behind him for approximately five minutes. Decedent's weight, his position on the ground and (apparently) his preexisting health problems caused him to suffocate. In rejecting the excessive force claim brought by the decedent's estate, the court ruled that "placing a person in a prone position while handcuffed on the floor does not, in and of itself, violate the Fourth Amendment," and it determined that there was no evidence that the police failed to take reasonable steps to monitor decedent's breathing. *Id*. The court also cited *Brownell* for the proposition that claims sounding in *res ipsa loquitur* do not suffice—the plaintiff

---

[4] Decedent's health problems, in addition to obesity, included an enlarged heart, an enlarged thyroid, Graves' disease and a thyroid storm.

[5] *Phillips* does support the notion that defendant police officers' initial restraint and takedown of Mohamed was reasonable; however, this issue is not is dispute.

must identify specific acts of misconduct by the officer(s) in question. *Id.* Yet here again, the Court noted that "[t]he medical evidence and witness testimony in this case shows that the officers did not punch, slap, kick or otherwise deliver a blow to Mr. Phillips' body." *Id.* at 593.

These two cases stand for the proposition that the mere fact that an injury occurred while an individual was in police custody is not sufficient to avoid summary judgment—a plaintiff must identify the specific unreasonable conduct that caused his or her injuries. However, in the case before us the plaintiff has identified the specific misconduct at issue—Brooks placing his knee on Mohamed's back—and she has introduced competent medical evidence indicating that it caused deadly injuries. This is not a case where plaintiff's theory of liability rests merely on the apparent occurrence of an injury while in police custody (like *Brownell*), or on the police's alleged failure to monitor a physically distressed prisoner (like *Phillips*). Rather, here it is alleged that Brooks knelt on the decedent's back with chest-crushing force, and the undisputed medical evidence reveals that decedent died of injuries consistent with a crushing or squashing-type trauma. As the plaintiff points out, the courts in both *Brownell* and *Phillips* noted that the relevant medical evidence did not reveal injuries consistent with excessive force. In the present case, the opposite is true. The plaintiff's claim here thus involves different facts, a different theory of liability and a crucial difference in the undisputed medical evidence than *Brownell* or *Phillips*. Those cases do not control the outcome here.

The defendants also place special importance on the fact that no eyewitness to the arrest reported seeing anyone hit, slap, strike or choke Mohammed. They distinguish the present case from others in which police violence was more pronounced or aggravated. *See, e.g., Champion v. Outlook Nashville, Inc.*, 308 F.3d 893 (6th Cir. 2004) (police sat on

a prone, restrained man and continued to pepper spray him for seventeen minutes); *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003) (police knocked Drummond to a prone position, one police officer knelt on him with both knees on his back, another officer placed one knee on Drummond's neck, and the officers laughed at Drummond's protests that they were choking him); *Frazell v. Flanigan*, 102 F.3d 877 (7th Cir. 1996) (officers kicked Frazell and beat him repeatedly with their night sticks after he was restrained).

Certainly, Brooks' conduct in this case does not appear to be as cruel or wanton as that at issue in the cited cases, but the evidence still supports an inference that it was unreasonable. All other details aside, it is undisputed that he knelt on Mohamed's back during the arrest. The reasonableness of kneeling on a prone individual's back during an arrest turns, at least in part, on how much force is applied. Kneeling with just enough force to prevent an individual from "squirming" or escaping might be eminently reasonable, while dropping down on an individual or applying one's full weight (particularly if one is heavy) could actually cause death.

Of course, Brooks maintains that he knelt only on Mohamed's right shoulder, and only with enough force to keep him from "squirming." But, contrary to the district court's suggestions, his is not the only possible account of the incident. The plaintiff asserts that Brooks knelt on Mohamed's back or neck with enough force to crush his chest cavity, collapse his left lung and inflict severe trauma on Mohamed's neck—and Dr. Adelman's medical report suggests that he may have done just that. All the medical experts in this case agree that Mohamed died of a collapsed lung and other injuries consistent with extreme external pressure, and Dr. Adelman asserted "to a high degree of medical probability and virtual certainty" that plaintiff suffered these injuries while being subdued by

police. Viewed in this light, Mohamed's undisputed attempts to "squirm" or arch his back upward while he was being restrained may not constitute resistance at all, but rather a futile attempt to breathe while suffering from physiological distress "akin to drowning."

While the district court suggested that Adelman's report is "conclusory" and that its admissibility at trial is an "open question," 2004 WL 2535426, at *11, even brief expert reports will suffice at the summary judgment stage. *See Vollmert v. Wisconsin Dept. of Transp.*, 197 F.3d 293, 300-01 (7th Cir. 1999) (to avoid summary judgment, a party's expert need not "give a primer on why the facts allow the expert to reach that conclusion"). Similarly, the plaintiff's proffered expert testimony that Brooks' tactics violated standard police practices, while not dispositive,[6] may also be deemed relevant to the reasonableness inquiry, as might the plaintiff's evidence that Brooks was aware of Mohamed's mental disabilities. *See* Brooks PRFF ¶¶ 59-68; *Drumond*, 343 F.3d at 1057-58 (decedent's mental disability must be taken into account in the reasonableness inquiry); *Deorle v. Rutherford*, 272 F.3d 1271, 1282-83 (9th Cir. 2001) (same).

In light of this evidence, plaintiff is correct that she is *not* asking the finder of fact to *speculate* about the cause of Mohamed's death (as the district court has contended) but rather is asking the fact finder to *infer* causation, logically, from undisputed facts and competent evidence. Such inferences are often necessary when the plaintiff's sole eyewitness is dead. Similarly, the fact that the available eyewitnesses support the defendants' account of things does

---

[6] "42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices." *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir.2003) (citations omitted).

not preclude the possibility of genuine factual questions. The sheer number of witnesses mustered by each side is not a relevant consideration, *Unterreiner v. Volkswagen of America, Inc.*, 8 F.3d 1206, 1214 (7th Cir. 1993) ("Perhaps Unterreiner could have recruited other employees to offer affidavits confirming his own recollection of things, but that would only have affected the quantity of the evidence on his side, not the quality. The number of witnesses for each party is not dispositive at trial, let alone on summary judgment."), and cases may always be proven by circumstantial evidence where direct evidence is unavailable, *Murrell v. Frank*, 332 F.3d 1102, 1117 (7th Cir. 2003) ("Circumstantial evidence is of equal probative value to direct evidence and in some cases is even more reliable."). Were it otherwise, a plaintiff might never prevail on an excessive force claim where the victim is dead and the defendant-police officer is the sole living eyewitness.[7]

We have previously held that medical evidence and other circumstantial evidence can be sufficient to create triable issues of fact in excessive force cases. *See Frazell v. Flanigan*, 102 F.3d 877, 884 (7th Cir. 1994), abrogated on other grounds by *Saucier v. Katz*, 533 U.S. 194 (2001) ("Consistent with the medical evidence . . . the jury could have determined that the officers had used force against [plaintiff] far more frequently than they were

---

[7] *See Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir.), *cert. denied*, 513 U.S. 820 (1994): "The award of summary judgment to the defense in deadly force cases may be made *only with particular care where the officer defendant is the only witness left alive to testify*. In any self-defense case, a defendant knows that the only person likely to contradict him or her is beyond reach. So a court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at a trial." (Emphasis added.)

willing to admit.").[8] Certainly plaintiff's proffered evidence—including Adelman's expert testimony—must be weighed against the eyewitness accounts offered by the defendants themselves and the two civilian onlookers (all of whom contend that the defendants did nothing untoward[9]). The conflicting conclusions of the medical experts must also be reconciled. But this is just another way of saying that there *is* a genuine issue of fact as to the excessive force claim, which must be sorted out by a jury. Concluding that Brooks knelt *only* on Mohamed's right shoulder and applied only reasonable force with his knee (as did the district court) ineluctably implies crediting Brooks' account of the incident and discounting Dr. Adelman's medical testimony. This, of course, is improper at summary judgment. At summary judgment a court may not assess the credibility of

---

[8] The Ninth Circuit also recently made a ruling to this effect in a case raising analogous factual questions:

> Here, the officers admit to having applied force when restraining Santos. A jury might find believable the officers' contentions that they did so gently, and accordingly might return a verdict in their favor. *Alternatively, a jury might find the officers' testimony that they were restrained in their use of force not credible, and draw the inference from the medical and other circumstantial evidence that the plaintiff's injuries were inflicted on him by the officers' use of excessive force.* After all, broken backs do not ordinarily result from the type of gentle treatment described by Officer Lee.

*Santos v. Gates*, 287 F.3d 846, 852 (9th Cir. 2002) (emphasis added).

[9] One cannot discount the eyewitness accounts out of hand (especially not at the summary judgment stage), though it is an open question whether anyone could tell, merely by looking, how much force Brooks applied to Mohamed's back or shoulder. Certainly one could see whether anyone applied a choke hold to Mohamed, but, as mentioned above, the plaintiff apparently does not advance such a claim.

witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

When the facts here are viewed, as they must be, in the light most favorable to the plaintiff, there remains a question of fact as to whether Brooks knelt at the location and in the restrained manner that he claims. Simply put, the cumulative weight of the medical evidence—particularly Dr. Adelman's testimony—combined with the undisputed testimony of Brooks' conduct during the arrest, supports an inference of unreasonable conduct, even if the eyewitness testimony does not.[10] As one of our sister circuits has observed, since the *Graham* reasonableness inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Santos*, 287 F.3d at 853. We agree. The ruling of the district court with respect to plaintiff's excessive force claim must be reversed and the case remanded for further proceedings.

---

[10] The dissent's suggestion that the medical reports are "hindsight" is misleading. Hindsight refers to the application of unrealistic standards to past events. The fact that the evidence here was necessarily acquired post mortem does not suggest that the evaluation of it was anything but realistic. Cause-of-death evidence must always be evaluated after the fact; the question is whether such medical evidence reveals that the defendant officers' conduct was unreasonable in light of the circumstances of the arrest as they were unfolding. Drawing inferences as to the reasonableness of police conduct in this manner does not impermissibly rely on "hindsight."

**B.  Failure to Intervene**

This leads us to the plaintiff's claim against officers Grady, Mueller and Murphy. Under *Yang v. Hardin*, 37 F.3d 282 (7th Cir. 1994), "[a]n officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Id*. at 285 (emphasis in original). This Court has implied that a "realistic opportunity to intervene" may exist whenever an officer could have "called for a backup, called for help, or at least cautioned [the excessive force defendant] to stop." *Id*. Perhaps more crucially, this Court has made clear that the prongs of this analysis almost always implicate questions of fact for the jury: "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury *could not possibly conclude otherwise*." *Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997) (emphasis added).

Yet even under this stringent standard, the question here is a close one. There is little direct evidence suggesting that Grady, Mueller and Murphy should have recognized that illegal conduct was occurring, or that they had a reasonable opportunity to intervene. As a general matter, it would be difficult to infer such facts solely from the kind of medical evidence introduced here, and all of the available eyewitnesses suggest that Brooks' actions did not appear unreasonable. On the other hand, it is undisputed that Mueller, Grady and Murphy were mere feet away from Brooks while the conduct in question occurred, and the plaintiff has also

introduced expert testimony that Brooks' efforts to restrain Mohamed violated standard police practices. While the question certainly gives us pause, we must conclude, under these circumstances and in light of the severity of Mohamed's injuries, that questions of fact remain with respect to the intervention claim no less than for the underlying excessive force claim.

Depending upon how the jury evaluates the evidence of Brooks' conduct, it could conclude, consistent with the evidence, that one or more of the other officers could and should have attempted to prevent Mohamed's injuries. Based on the medical evidence, a jury could determine that Brooks choked or otherwise abused Mohamed in a fashion visible to onlookers. At the least, a reasonable jury might conclude (if the plaintiff's theory of the case is credited) that the other officers should have cautioned Brooks to stop kneeling on Mohamed's back. *Cf. Yang*, 37 F.3d at 285. Such a conclusion would render the plaintiff's intervention claim quite tenable. Thus, given that the excessive force claim against Brooks is not amenable to summary judgment, the associated failure to intervene claims must go to trial as well. The parties have not identified any consideration that would warrant straying from this Court's directive in *Lanigan,* which instructs that the intervention inquiry should be left to the jury.

As a last-ditch effort to win the day, defendants argue (in just three pages of their appellate brief) that they are entitled to qualified immunity. In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id*. at 818. Thus, in order to survive summary judgment on grounds of qualified immunity, a plaintiff must

(1) allege violation of a valid legal right and (2) demonstrate that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 201-02.

Here the plaintiff has certainly alleged violation of a valid constitutional right—if defendant Brooks applied deadly force to Mohamed while he was lying prone on the ground with his arms behind him, this would violate Mohamed's Fourth Amendment rights, as would an unjustifiable failure by the other officers to intervene. However, whether it would have been clear to a reasonable officer that Brooks' actions constituted unreasonable force under the circumstances—thus triggering the duty to intervene—is obviously a more difficult question. Presumably, if it would have been apparent to the other officers, just by watching, that Brooks was applying potentially deadly pressure to Mohamed while he was lying prone, then the officers would not be entitled to qualified immunity. Again, no one contends that deadly force was warranted in this case.

However, it may have been difficult to tell how much force Brooks was applying, and at least one or two of the officers (those attempting to restrain Mohamed's legs) had their back to Brooks during the encounter. Additionally, this Court's 1997 decision in *Estate of Phillips* ruled that a similar takedown—during which one officer put a knee in Phillips' back for about one minute—was not unreasonable under the circumstances. 123 F.3d at 593. However, since the very nature of Brooks' conduct remains undetermined, one can only speculate as to how visually obvious any violation of Mohammed's rights might have been. In other words, without knowing what Brooks did or how his conduct appeared to onlookers, it would be difficult to say that, as a matter of law, a reasonable officer could not have known that Brooks' conduct violated Mohamed's constitutional rights. A jury should decide whether Brooks' actions would have made it clear to a reasonable officer that intervention

was warranted, and, if so, whether Grady, Mueller and Murphy had a realistic opportunity to intervene.

Accordingly, we also reverse the district court's grant of summary judgment in favor of the defendants on plaintiff's failure to intervene claim and remand this claim for further proceedings as well.[11]

## IV.  CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of summary judgment in favor of the defendants and REMAND the case for further proceedings not inconsistent with this opinion.

EVANS, *Circuit Judge*, dissenting.  Although I agree, as the majority observes, that this case marks the "tragic final chapter" in the life of Jamal Mohamed, I do not think his survivors offer sufficient evidence to keep the case going any longer. I would affirm Judge Crabb's order granting summary judgment for the defendants.

As the majority notes, "the plaintiff's claim must fail if Brooks' conduct is considered reasonable as a matter of law," a standard discussed at length in *Brownell* and *Phillips*. The majority reads those cases to "stand for the proposition that . . . a plaintiff must identify the specific

---

[11] Obviously, there is substantial evidence exculpating all four of the officers, which will be heard by the jury.

unreasonable conduct that caused his or her injuries." The majority distinguishes those cases by finding that, unlike *Brownell* and *Phillips*, the plaintiff here (Mohamed's mother) identifies specific unreasonable conduct—Brooks pushing down on Mohamed's back—and presents sufficient medical evidence to support the claim.

While Brooks' actions might well have caused Mohamed's death, I part company with the majority on the question of whether the evidence is sufficient to show that his actions were in any way unreasonable under the circumstances. In answering that question, the majority cites the medical report suggesting that Brooks might have pushed too hard on Mohamed's back or neck while trying to restrain him. Relying on that report, however, ignores the well-established rule that a police officer's conduct in a struggle like the one that occurred here must be judged from the perspective of a reasonable officer on the scene, not the "20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 395 (1989).

It was that understanding of the law, and not just the failure of the plaintiffs to identify specific conduct, that led us to reject "logic akin to the doctrine of res ipsa loquitur" in a situation like the one we have here. *See Phillips*, 123 F.3d at 594; *Brownell*, 950 F.2d at 1292. By relying on the medical records to support the plaintiff's claim that Brooks might have pressed too hard, however, that is precisely the logic the majority uses. The question is not whether, looking back, Brooks might have pressed harder than he should have—in hindsight, perhaps he did. Instead, though, we should ask only whether, at the time, Brooks acted reasonably. And, given what appeared to the police on the scene to be a very dangerous situation, the plaintiff offers no evidence that Brooks' actions, including pushing down on Mohamed's back to get him under control, were unreasonable.

Throughout the short encounter, Mohamed acted erratically and violently. He punched nurse McCarty and began swinging his belt over his head when Officer Murphy approached him. He strenuously resisted as police tried to handcuff him. It was only then—while a man, who had just punched someone trying to help him, threateningly swung his belt at a police officer, and tried to resist, even when on the ground, as several officers tried to handcuff him—that Brooks began applying weight to Mohamed's back and shoulder area. Brooks' knee was on Mohamed for around a half a minute, and Mohamed was breathing when Brooks got up (suggesting that Brooks had no reason to know that he was pressing too hard, if he in fact was). The plaintiff offers absolutely no evidence to rebut this view of what happened. As Judge Crabb observed, "[t]he undisputed evidence shows that defendant Brooks applied force to Mohamed's body in a manner and for a time period not likely to cause any serious injury to Mohamed." That the force applied may have, in fact, caused a fatal injury to Mohamed is tragic, but it does not mean that the force applied was unreasonable. For these reasons, I respectfully dissent.

A true Copy:

     Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*